and we'll begin with counsel in National Credit Union versus U.S. Bank, etc. Go ahead, Mr. Frederick. Thank you, Judge Cabranes, and may it please the Court. All agree here that the Bank of New York has the right to bring the claims for the note holders and the NCUA, and the NCUA has a beneficial ownership interest in the waterfall pursuant to Section 2.09e of the indenture. There's no question that the breach of contract claims are valid claims. They are legally sufficient. So the only question here is when Bank of New York chose not to bring the suit and acquiesced in the NCUA bringing the suit, does that confer either derivative standing or an ability to bring a substitute trustee? I know it's not directly relevant to the arguments you're about to make, but is Bank of New York in breach of any obligation by declining to bring this action? Well, not when they acquiesce to allow us to do so. Under the Kaplan decision by the Delaware Supreme Court, their acquiescence to our bringing the claim gives the NCUA derivative standing, and Bank of New York also agreed to the substitute trustee. So the only question here, Judge Carney, is whether the district court erred in not allowing us one of those two routes to have standing to bring these claims, and we submit that the court erred under both theories of standing. If I could start, because of limited time, with the substitute trustee claim, the district court seemed to think that we were too late because, having gone through two rounds of trying to plead the derivative standing in a fashion that would be satisfactory, Judge Shindlin in the HSBC case had already found NCUA to have derivative standing by the time this came to Judge Forrest. But Judge Forrest thought that because of finality reasons, we should be precluded from substituting a separate trustee. That was in contrast to this court's Quartino decision, which we cited on page 44 of the brief, which makes clear that the standard is whether there's unfair prejudice or undue delay or dilatory tactics or bad faith. None of those findings were made here. The question is really whether finality is going to trump what would be valid claims that could be brought by the NCUA against the banks here, and we would submit that that's not a sufficient reason. That is a breach of the discretion that the district court has, and so at the very least, the case needs to go back. The case has been reassigned to Judge Engelmeyer for consideration of the propriety of the substitution of the separate trustee. Mr. Frederick, let me intrude, if I may, to go back to Judge Carney's line of questioning, because I have similar concerns. Now, the Bank of New York did not want to bring this action, is that right? Correct. To pursue Judge Carney's question, isn't that a violation of the Bank of New York's fiduciary duty as indentured trustee? It would if there was no route that we could bring these claims, but under the well-settled Kaplan decision in the Delaware court. Before we go off to well-settled cases elsewhere, this is an innocent view of these matters, so forgive me, but why didn't you sue the Bank of New York for violating its fiduciary duty? Because they gave us the permission to bring this suit. There's no difference in how the suit is going to be prosecuted, what defenses are going to be made, how the recoveries are going to flow through. It's simply a ministerial question of who is best positioned because of their interest to bring this suit. We had no problem in the sense that the Bank of New York was giving us permission to pursue the very same claims that the Bank of New York could. So the real question here is, given that this is not going to affect the prosecution of the lawsuit in any measure, whether the defendants are entitled to a windfall, because the district court was confused about the role that Article III jurisdiction and standing play in the calculus of who has the right to bring these suits. Why don't you help us by pointing to a provision in the indenture agreement that gives the NGN Trust a beneficial interest in the indentures? Sure. Let's start with the granting clause, which is at page A434. And the granting clause makes clear that the NGN Trust estate is the beneficiary of any actions that are being brought. The indenture waterfall provision at 2.09, which is at page A461. The very last one makes clear that the certificates, which are owner trust certificates, are at the very end of the waterfall. The certificates are defined in the agreement, in the indenture agreement, as those residual interests once all the note holders have been paid off for the benefit of the trust estate. The owner trust certificate are beneficial interests. That's at section 6.07. And importantly, the duties of the indenture trustee, Judge Cabranes, at 5.01, make clear that the purpose behind the indenture trustee is to implement and protect the interests of the trust estate. Hold on a second. You'll have time. Don't worry about- Thank you. Having to be interrupted. But let's go back to the appendix, the various provisions to which you were pointing us. First, at A434, what is it that I'm supposed to find at A434, which is now open before me? At A434, if you look at the very end of the granting clause, it says, constitute all or part of, including in the proceeds of the foregoing, collectively the trust estate. So everything that's been granted here is to benefit the trust estate. The trust estate, in turn, has a series of payments that are going to flow into it. That's at the waterfall provision, which is on section 2.09E. That's at page A461. Hold on one second. All right. A461. Help us. So if you go down to the little Romanet IX, that's any remaining available funds to the holders of the certificates. Okay? So the note holders have been paid off, the guarantee provision has been satisfied, and there is presumably money left over if the claims are allowed to proceed, because the trusts have lost money on these mortgage-backed securities. So the question here is, the only entity that has a beneficial ownership interest in these trusts is the NCUA. As the liquidating agent, it has an interest in the upside through these owner trust certificates. As the guarantor, the agency is obligated to pay the note holders if there's not enough money in the trust to pay off the note holders. The note holders have no interest. They have no incentive. They have no power to do anything but collect guaranteed payments from the NCUA. So the way this trust was designed and the indenture was designed to be implemented was to give the NCUA both the potential upside and be responsible for the potential downside. That's why the NCUA wants to pursue these claims, notwithstanding the fact that the Bank of New York is a defendant in similar claims in other places and therefore did not want to bring this particular suit. So when you go back to the indenture, it's very important, Judge Cabranes, also to look at Section 5.01, which is on page A479. And if I could direct the Court there, it's very important to understand that the interest, that the powers of the indenture trustee is the true and lawful, and I'm reading at the very beginning, the issuer irrevocably constitutes and appoints the indenture trustee as its true and lawful attorney, in fact, with full irrevocable power and authority in place. And then it goes down, for the purpose of enforcing the rights, powers, and remedies of the issuer, that's the NGN trust, under the trust agreement, which is the trust agreement that was signed and ratified the very same day. And to take all the appropriate actions in order to do so. And the A1 subsection makes clear that the purpose behind that conferral of power is, quote, to protect the interests of the note holders and the guarantor. So when you look at what the indenture trustee is designed to do, it's to protect the power and the assets of the trust estate. And one of the key assets here are these claims for breach of the fiduciary duties and the breach of contract claims that have been brought on behalf of the NCUA for the benefit of the trust estate. Now, the trust estate then links in and — But am I correct that there are two different kinds of interests? One is the residual interest, which is the upside that you seek to amend so that you can pursue directly. And the other is a kind of equitable interest that remains in the other trust as to which the payments haven't been completed or we don't really know how those are going to come out. Is that right? That's correct. As to those that you seek to amend to add the separate trustee to pursue those? The separate trustee will be pursuing both. The separate trustee would be standing in the shoes of Bank of New York. That would be under the theory that we don't have derivative standing under the Kaplan decision and the way Delaware Statutory Trust Act works. And if you were to disagree with the long and complicated briefing on that point, we would submit that on the — And there are a number of district courts that have held that way. Isn't that right? There are a couple of district courts that have held that way. That is correct, Judge Carney, although what Judge Faya recently did in the Wells Fargo II case was to uphold the appointment of the substitute trustee. That's Blackrock? Yes, that's correct. And in that case, what Judge Faya ruled was that there was no undue delay or bad faith or anything of that appointment. That also was premised on her decision that all the rights, title, and interest were transferred. That's the kind of thing that I was — That's correct. And so what that does is that brings into play the interplay between the granting clause, which grants all the rights, and then the residual interest, which is under the trust agreement, which is set forth at Section 3.03. That's at A559. And in that, what the trust estate gets back, the owner trust certificates. So it is true that the granting clause gives all the rights, but what the trust does is it reserves — That's the theory on which we are proceeding with this claim. Am I right in understanding that this structure, the creation of the trusts and the indenture trustee and so on, kind of complicated structure, was the structure adopted in all instances of RMBS takeovers by the NCUA after the defaults? Is that right? That's correct. And the reason, Judge Carney, was that when the five largest — five of the largest credit unions failed, the agency faced the most catastrophic crisis in the 80-plus year history of the agency and needed to find a way to recapitalize. So what it did was it formed these trusts. It took the toxic mortgage-backed securities. It put them into these trusts to repackage them, to sell them to investors with the guarantee wrapped on top. My question goes really to this is over a million dollars' worth of failed mortgage-backed security pools that have been restructured in a way that a number of district courts has found flawed. Is that right? I would not say flawed. I would say that for purposes of advancing this particular form of standing, the district courts have found it unsatisfactory. I don't think that — you know, from the perspective of looking at it from a standing-to-bring-suit theory, I don't think they contest that the Bank of New York could bring these claims. So ultimately, what you're looking at is kind of a footfall to the agency in drafting these agreements in emergency circumstances, not square off the exact language that would create direct standing. But it took several years for that to emerge, for the agency to accept that transferring all right, title, and interest meant transferring all right, title, and interest. Right, and that's because the trust itself provided for the give-back of the owner-trust certificates, which are clear beneficial interest. And so when you have a beneficial ownership interest and the note-holders have no incentive to bring suits because they're guaranteed, they get their payment guaranteed, the only entity that has a real interest in the trust estate's assets is the NCUA, either in its capacity as liquidating agent so that the estates of the failed credit unions will have more assets and thereby be able to pay off more creditors, or if these notes, these guaranteed notes, were to be insufficient to pay the note-holders, the NCUA as an agency is going to have to pay the guarantee. So it is true that in litigating these over multiple years, the district courts of the Southern District have found, you know, various issues with the way these documents were put together, but I don't think that that should affect what this court has to decide, which is in the face of valid claims where there's clear interest and there are theories for either derivative standing or an appointment of a substitute trustee, we should be allowed to bring and continue these suits. Before you sit down, quick question about the second amended complaint. Can you tell us why you waited until after the second amended complaint was dismissed to have Graham Bush named as a separate trustee? Yes, because under the Loralee financing case, this court had held that a plaintiff should not be put to the, quote, of standing when it had not gotten a definitive ruling on the standing in place. And we think that the district court here pretermited our right understanding under the Loralee financing case where these are admittedly complex transactions, as complex as they were in the Loralee financing case itself. Thank you. You've reserved some time. Yes, thank you. We'll hear from Mr. Rowley. May it please the court, Fred Rowley, Jr. for Bank of America and the U.S. Bank Appellees. What you didn't hear from Mr. Frederick in response to Judge Cabranes' question is any provision in the indenture that permits NCUA as a certificate holder or issuer to direct Bank of New York Mellon to bring the RMBS claims that are at issue here. And there's two fundamental reasons for that. The first is because the indenture makes clear that Bank of New York Mellon, as the indenture trustee, acts on behalf of the note holders and the guarantor. The two parties that may direct Bank of New York Mellon as indenture to bring these claims are the note holders and the guarantor. It does not provide that the issuer or the certificate holder may do that. And that gets to a fundamental problem with NCUA's derivative theory. NCUA is seeking to bring these claims, the RMBS claims, on behalf of the NGN Trust. The problem, as Judge Forrest correctly noted, and as Judge Faya noted in the BlackRock case, is that the NGN Trust doesn't have the claims. The granting clause here is very clear, and it's broad. And by the granting clause, the NGN Trust assigned all of its rights and interests in the RMBS securities and the related claims to the Bank of New York Mellon. So the Bank of New York Mellon has the claims, and as a result of that, NCUA cannot stand in the shoes of the NGN Trust and assert those claims. Now, one important point to note also is that if you look at the terms of the indenture, and the indenture is controlling while the notes are outstanding, while Bank of New York Mellon is still making these payments on the notes and still administering the notes, it's very clear that other terms confirm that the assignment of the RMBS securities and the claims was complete. You've got provisions that say that before the transfer of the trust estate, which includes the RMBS securities and claims, the trust warrants that it, quote, had good title to and was the sole owner of each underlying security. And then after the transfer is completed, it says that the trust shall not have, and I'm speaking of the indenture here, section 6.05, shall not have a legal, equitable, or beneficial interest in the collateral account, which is where the trust estate is deposited. If we were to agree with you on that analysis, Judge Fala allowed amendment to add a separate trustee and to reconfigure the complaint. Yes, Your Honor. And I wonder why it wasn't an abuse of discretion for Judge Forrest to deny leave to amend. Your Honor, Judge Forrest properly exercised her discretion in denying leave to amend here because NCUA had simply waited too long and also because NCUA had a fair opportunity to— But were you prejudiced in any way? Your Honor, this Court's cases are clear that prejudice isn't a bright-line requirement, and the basis of Judge Forrest— But is the answer we were not prejudiced? No, Your Honor. We absolutely were prejudiced. Could you describe how? Absolutely. Because Judge Forrest adverts to this in her decision. As Judge Forrest notes, allowing NCUA at the late stage of the litigation, and she noted that 18 months had lapsed— You said it was a late stage, but had discovery occurred? No, Your Honor. Discovery had just occurred, but it hadn't proceeded in earnest at that point. But I would note that allowing the appointment of the separate trustee at that point of the litigation would introduce new issues, new substantive issues into the case, and that would include whether the extender statute of limitations that applies to NCUA is properly applicable to the separate trustee, and if not, which state's statute of limitations applies. There would be accrual and relation back issues. So you would have these new issues that would be introduced. I don't understand that as prejudice, so that happens when complaints are amended, that new issues are raised. But in what way are you prejudiced? Your Honor— At that point, as Judge Forrest noted, spent 18 months litigating this derivative standing theory. That was an extensive amount of litigation over a theory that was doomed to fail, and it was crystal clear, as the Court noted, after the order on the first amended complaint. And so the point is that NCUA had the chance to present its derivative theory, and when Judge Forrest noted in her order, May 2015 order, dismissing the first amended complaint, that it would have one more opportunity to plead, it should have, if it wanted to, pivot to the separate trustee theory at that point. But it persisted with this derivative theory, and at that point, NCUA was the only party that had the terms of the indenture and had the terms of the trust agreement, and if you look at the order on the— I'm sorry, you were saying those terms were unknown to you? Your Honor, we didn't have the indentures at that point, and we didn't have the trust agreement, but NCUA did, and if you look at the May 2015 order, so this is the order dismissing the first amended complaint, Judge Forrest clearly puts the issue of assignment on the table. She clearly indicates that whether NCUA would have derivative standing or direct standing would rest critically on whether it had assigned away the claims. This is in the front half of her order, her May 2015 order. I would also note that on the same day Judge Forrest issued that order, she had issued the Phoenix Light decision, where she did have indenture language, like the granting clause in front of her, and she noted that that kind of language assigns away all the rights and interest in the claims. And so NCUA had before it not just an order from this judge that said that assignment was a critical issue, but also an order in a related case, and NCUA had asked that Phoenix Light be treated as a related case, issued by the same judge dealing with indenture language, treating it as a full and complete assignment. And so NCUA had all the information it needed to know that there were real problems with its derivative theory, and it made the choice to persist in that theory instead of, at that point, seeking the appointment of the separate trustee. And so it is really important to note that the district court did give NCUA the opportunity to present that theory, and if it so chose, to then move to the separate trustee theory. And that's why the Lorelei decision that my friend Mr. Frederick referenced is an opposite, because that decision involved a situation where a district judge did not give a party a reasoned decision, identifying the defects with a complaint. There had been no motion practice in that case, whereas here there were two rounds of motions to dismiss on the derivative plaintiff theory that NCUA advanced. And it is, under this court's decisions, it is sufficient for the district court, in the exercise of its discretion, to conclude that a party has unduly delayed in presenting a theory. I would point to the Zara case as an illustration of that. That even apart from any prejudice analysis, and we submit that we did suffer prejudice, but even apart from that, the district court here properly exercised its discretion.  I'm sorry. Petaling back to the very beginning of the case, I understand your position that NCUA was not the proper party to sue and that it didn't have rights, having transferred them all to the trust. Yes. But do you dispute that NCUA has Article III standing? Your Honor, Judge Forrest, we haven't pressed Article III standing on appeal, and the reason is because it wasn't the ground for Judge Forrest's denial of leave to amend. I think she suggested it. She made mention. Yes, Your Honor. But it wasn't the ground. But I'm interested in knowing whether you would agree that, given at least the residual interest that the NCUA has and its position as guarantor and so on, it had at least Article III standing to pursue this suit. Your Honor, the issue isn't before the court, but we would submit that if you look at the court's decisions in Huff and Advanced Magnetics, that there is an argument that NCUA didn't have Article III standing because it assigned the way of the claims. It does bear in our jurisdiction. It does, Your Honor. Therefore, if there's a question, we're kind of bound to look at it. So I'm interested in knowing your position. Judge Carney, it does bear on the court's jurisdiction. On the other hand, as in the Facebook case, the district court may choose grounds apart from Article III standing that are threshold grounds, like whether a plaintiff has adequately pled derivative standing. It may choose that ground and not reach the Article III issue, and that's what the district court did here. So you are not taking a position. You do not concede Article III standing, notwithstanding the residual interests of the agency. No, Your Honor, we haven't litigated that, but we would have arguments on that. Mr. Raleigh, while you're up. Yes, Your Honor. Let me try to move away for the moment from these quite subtle and important principles of standing, derivative, plaintiff theory, assignment, and other indenture language. Just perhaps you could describe to us who will get what if you prevail. A, how much is involved here, and who's going to get it if you win? Well, Your Honor, I represent the banks. As far as who's got it, I think Your Honor, who has the interest? And my friend, Mr. Frederick, argued. It's a much more fundamental question. Sure. If you prevail here, well, first of all, why don't you tell us first what sort of decree you would want from us? What is the result that you want here? And then tell us what the result of that decision would be. Sure, Your Honor. We would like the court to affirm Judge Forrest's exercise of discretion in denying NCA leave to supplement the complaint and also to substitute in the separate trustee, and then with respect to the unwinding allegations, her discretion to deny leave to supplement with respect to those also, and then to affirm her ruling on derivative standing. At that point, if the separate trustee wishes to attempt to refile the claims and to assert the RMBS claims, it is entitled to try and do that. And the statute of limitations? Your Honor, we would have defenses, and we would urge those defenses. But the point is, there's nothing in Judge Forrest's ruling that prevents the separate trustee, if it wants to, to try and assert those claims, and then we would assert our defenses. What Judge Forrest decided was that in this case, given the undue delay, given the expenditure of judicial resources and party resources, she would not allow the late appointment and supplementation to add the unwinding allegations in this case. That's all she ruled. It was not a merits determination. Thank you. It's clear, I think, from the presentation that the banks don't suffer any prejudice here, except for the windfall that they want to have if they don't have to defend this suit. And if there is not a permission for the substitution of Mr. Bush as a separate trustee, there clearly are going to be statute of limitations issues. And the pocket veto that he's trying to assert here is to be able to preclude us from bringing these claims at all, which are concededly meritorious claims. I'd like to follow up on Judge Cabranes' question and ask you to answer his question. Yes. The money would flow through the trust estate in the way that Section 2.09 of the indenture contemplates, so that the money comes into the trust estate and there's a waterfall provision that says who gets paid out in what order. And those assets — Can you give us a range of value? We're talking about hundreds of millions of dollars that we believe would be recovered in this action. And that would inure ultimately to the benefit of the liquidation estates of the failed credit unions through the owner trust certificates, or to protect the agency from having to invoke the guarantee under the full faith and credit of the United States that was given on these wrappers. So the agency has a very strong interest here. That's why the Associate General Counsel is with me at counsel table, because the agency cares about whether or not it can bring these claims and whether or not the substitution or whether you do it through derivative standing. And I would submit, Judge Carney, that at the time all of this was happening, we had Judge Schindelin's order saying that derivative standing was okay. So I don't think you can say that we acted in some dilatory fashion or in bad faith in some manner. We had a district court decision from a distinguished judge saying we could bring these claims through derivatively. Notably — How many similar suits are pending? There are three other — in the country I don't know, but the NCUA has three other pending suits. In this circuit? In this circuit, in the Southern District. Two of them are proceeding, one on the derivative standing theory, the other on the substitution of the trustee theory, and the third has been in abeyance. I would have expected that there would be others around the country, but I take it you don't know. Well, because the NCUA has the power over all the credit unions, it has consolidated these actions against the trustee and brought them in the home forum of the banks where the trustees were. And so that's why there are only a few of these. There are hundreds of millions of dollars at stake, but what they would do is to flow through the waterfall. Now, I want to make clear that there is no argument here about the futility of substitution, so that part of the normal amendment process is not brought. It's simply an allegation about the dilatoriness, but the substitution was made six weeks after a definitive ruling on the second amended complaint was filed, which I don't think, given — And why not earlier? Because the Bank of New York is a complicated bureaucracy. The United States government is a complicated bureaucracy. I think everybody did the best that they could in the circumstances. This was the very first time the NCUA had appointed a separate trustee because at that time the state of the law was Judge Schindler's decision, which is that we can bring these as derivative standing claims. And so it took a little bit of a while to get the mechanics of that going up, but I don't think that you could argue that there is a dilatoriness or bad faith on the part of the agency having to adopt what is novel ground. Now, my friend here says that the note holders have the power to direct. That's actually not correct. If you look at 11.02 of the indenture, the guarantor has the sole power to determine when the Bank of New York would be able to bring the litigation, and that is because the guarantor essentially is preserving — is the final backstop on these trust estates. The theory that he's propounding, that the Bank of New York somehow has some free-floating theory in order to bring these claims, really doesn't make sense if you understand what the role of a trustee is in a trust, which is to protect the trust assets. And he does not address the power provision, which is 5.01, which makes absolutely clear that the only reason why the Bank of New York is in this is to protect and advance the interests of the trust estate. Finally, this Court's decision in Rajaman makes very clear that outsiders to this type of trust arrangement should not have standing to be complaining about this. Judge Carney, I accept your point that the drafting here was not pellucid, but the idea behind — The problem was it was too pellucid. Well, it was and it wasn't if you accept the idea that the giveback of the owner trust certificates made very clear who has the beneficial ownership interest of the estate. And so the fact that the granting clause gives all the claims, the empowerment clause of 5.01 says how to exercise them, which is protect the entire trust estate. And so Rajaman says if the beneficiaries and the trustee get together and they're okay with how to construe the trust document, it's really not for outsiders to be complaining about that. The banks make that argument all the time when people are coming and complaining about their trust agreements, and here they're trying to use that as a sword to preclude the NCUA from bringing these claims. Unless the Court has anything further, we'll submit. I'll give Mr. Rowley one minute because I've given you some extra time. Sure, Your Honor. So with respect to Rajaman, that case is very different because in that instance you had a party who was not a party to the contract asserting contractual rights offensively as the plaintiff. And here we're simply noting that because NCUA and the NGN Trust, and that's important, given Mr. Frederick's derivative theory that NCUA is suing on behalf of the NGN Trust, that they've assigned the claims away, they can't establish the black letter requirements for derivative standing as Judge Forrest noted. And with respect to the provisions of the indenture, 11.02, the provision that Mr. Frederick referenced merely notes that the guarantor has to consent to any direction by the note holders. But it's very clear that the indenture trustee acts on behalf of the note holders and also the guarantor. That's clear from the granting clause, which says that the indenture trustee holds a trust estate on behalf of the, and for the benefit of the note holders and the guarantor. It's reflected in other provisions that, for example, say that if an EOD occurs, an event of default occurs, then the indenture trustee is to act on behalf of the note holders and the guarantor. But the critical point here is the point that Judge Carney adverted to or referenced a moment ago, and that is that the granting clause is very clear. And as Judge Faya noted in Black Rock, the word all means all. And all the rights and interests in these claims have been assigned to Bank of New York Mellon. Bank of New York Mellon is not a trustee of, and certainly not a statutory trustee of the NGN Trust. It is an indenture trustee that represents the interests of the note holders and the guarantor. And for that reason, the derivative theory here simply falls apart. And Judge Forrest was correct in arriving at that determination. Thank you very much. We'll reserve decision. And thank you both for excellent arguments.